Floyd **SPRUYTTE,** Plaintiff-Appellant,

v.

Richard **WALTERS** and Ronald Schink, Defendants-Appellees.

No. 82–1676.

United States Court of Appeals, Sixth Circuit.

Submitted Oct. 16, 1984.

Decided Jan. 28, 1985.

Rehearing and Rehearing En Banc Denied March 27, 1985.

Meri Anne Stowe, Lansing, Mich. (court-appointed), for plaintiff-appellant.

Frank J. Kelley, Atty. Gen. of Mich., Thomas C. Nelson, Asst. Atty. Gen., Corrections Div., Criminal Appeals Section, Lansing, Mich., for defendants-appellees.

Before MARTIN and JONES, Circuit Judges, and WEICK, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

Floyd Spruytte, an inmate at the Michigan Intensive Program Center, Marquette, appeals the district court's *sua sponte* dismissal of his *in forma pauperis* complaint under 42 U.S.C. § 1983. We reverse and remand the case to the district court.

In *Tingler v. Marshall*, 716 F.2d 1109 (6th Cir.1983), we held that a district court may not *sua sponte* dismiss a complaint without allowing service of the complaint on the defendant and permitting the plaintiff to amend the complaint or respond to the court's notice of intent to dismiss. *Id.* at 1112. The *Tingler* rule does not apply to dismissals of *in forma pauperis* claims as frivolous under 28 U.S.C. § 1915(d). The district court's dismissal, therefore, must meet the requirements of section 1915(d). In *Malone v. Colyer*, 710 F.2d 258 (6th Cir.1983), we held that a complaint may be dismissed under section 1915(d) "if it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Id.* at 261.

Rather than a summary remand, we feel it appropriate to review the record as a whole to determine if in fact the complaint was "frivolous." Many of the issues in this case are affected by facts that are a matter of public record, and the brief for the prison officials contains several significant admissions.

Spruytte's *pro se* complaint, which seeks declaratory and injunctive relief as well as money damages against two prison hearing

officers in their individual and official capacities, alleges that prison officials refused to give him a paperback dictionary that his mother had mailed to him. Spruytte requested an administrative hearing and a staff assistant to aid him. Spruytte asked the assistant to obtain a copy of an opinion by the Marquette Circuit Court which he claimed entitled him to receive the book.

Without notifying Spruytte of the date or time of his hearing, prison officials called Spruytte to the office for a hearing. At that time, Spruytte's "assistant" told Spruytte that it was his responsibility to obtain the state court opinion, so no copy was available. Spruytte requested an adjournment of the hearing so that he could obtain a copy of the decision. This request was denied. The hearing officers found that Spruytte was not entitled to receive the dictionary, and they ordered that it be returned to his mother at his expense. Spruytte then filed this *pro se* action against the hearing officers.

Spruytte's complaint, liberally construed, *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam), is that the officials' actions deprived him of a property interest without due process of law under the fourteenth amendment. Specifically, Spruytte claims that state law confers on him a property interest in receiving books that do not threaten the security of the prison. He claims that the officials' refusal to give the dictionary to him was based on a Department of Corrections policy that is invalid under Michigan law and that application of that policy to defeat his constitutionally protected property interest was a denial of due process.

The state-law source of the property interest claimed by Spruytte is a prison regulation found in Michigan's administrative code. Rule 791.6603(3) states in part:

A resident may receive any book, periodical, or other publication which does not present a threat to the order or security of the institution or to resident rehabilitation.

At the administrative hearing, prison officials did not contend that the dictionary

sent by Spruytte's mother was "a threat to the order or security of the institution." Instead, the officials claimed that the dictionary was properly withheld pursuant to a "publisher-only" rule contained in a policy directive of the Department of Corrections. This Policy Directive, PD–BCF–63.-03, provides: "Prisoners shall have access to all books, periodicals and other publications except ... material received from sources other than directly from authorized vendors or publishers." The text of the hearing officers' decision states:

**REASON FOR DISPOSITION:**

Rejection of above material upon: the MDOC *Mailing Regulations Concerning Books and Magazines for Resident Reading* which indicates that "books and magazines must be ordered through your counselor." Policy Directive PD–BCF–63.03 which exempts written "material received from sources other than directly from authorized vendors or publishers"; and *Admin.Rules and Statutes* R791.-6603(3) from which above 2 Departmental guidelines are derived. This decision is based upon these DOC policies and directives since they constitute the source of hearings decisions, as court orders and decisions cannot be included in the hearings process until implementation by the DOC takes place. A postponement of this hearing is denied as the responsibility for obtaining the aforementioned court order lies with resident, such liability for obtaining materials not being the hearing officer's and hence not a legitimate reason for delaying this decision.

In the context of this case, the question whether state law creates a property interest in Spruytte's receipt of non-threatening publications requires us to make a two-step inquiry. As a first step, we must determine whether, as a matter of state law, Spruytte is entitled to receive the dictionary. This requires us to decide whether, as Spruytte claims, the Department of Corrections' Policy Directive PD–BCF–63.03 conflicts with Michigan's Administrative Rule

791.6603(3).[1]  If Spruytte is entitled to receive the dictionary as a matter of state law, we must determine whether, as a matter of federal law, Spruytte's state-law entitlement rises to the level of a federally protected property interest.

We are not the first court to consider whether Michigan law entitles prisoners to receive non-threatening publications. Spruytte's complaint states that he had asked a staff assistant to obtain a copy of a state court decision which Spruytte claimed entitled him to receive the dictionary.  The case that Spruytte sought, *Marsh v. Michigan Department of Corrections*, No. 11531 (Marquette Cir.Ct. March 3, 1981), squarely holds that, as a matter of state law, the Department's publisher-only rule conflicts with Administrative Rule 791.-6603.  The Marquette Circuit Court subsequently has reiterated the position it took in *Marsh*.  In *Mithrandir v. Michigan Department of Corrections*, No. 11531 (Marquette Cir.Ct. Feb. 11, 1983), a prisoner at the Michigan Intensive Program Center was sent a package of ten paperback books from a bookstore.  Authorities at the prison mail center rejected the package and officials at the subsequent administrative hearing upheld the rejection based on the publisher-only rule contained in the Policy Directive.  Mithrandir then sought relief in state court, claiming that the Policy Directive is invalid as a matter of state law.  Marquette Circuit Judge Edward A. Quinnell agreed:

> Defendant concedes that the present 10 paperback books do not contain contraband nor is their content such that they would be rejected under the [administrative] rule.  However, defendant maintains that the receipt of *any* used book presents "... a threat to the order or security of the institution ..." in that used books may conceal currency, razor blades, or may contain drugs absorbed by the paper.

I cannot agree with that interpretation of the rule.  The rule clearly provides that a resident is to receive *any* book, not just new books, provided that they do not threaten the institution.

*Mithrandir v. Michigan Department of Corrections*, slip op. at 2–3.  Judge Quinnell concluded, "I find, as I have previously found, that the Policy Directive is incompatible with the Administrative Code provisions...."  *Id.* at 2.  On at least three occasions Judge Quinnell has found the Department in contempt of the Marquette Circuit Court for preferring its Policy Directive to the controlling Michigan Administrative Rule.  See *Mithrandir v. Michigan Department of Corrections*, No. 11531, slip op. at 4 (Marquette Cir.Ct. Feb. 11, 1983); *Mithrandir v. Michigan Department of Corrections*, No. 11531 (Marquette Cir.Ct. Nov. 5, 1981); *Marsh v. Michigan Department of Corrections*, No. 11531, slip op. at 4 (Marquette Cir.Ct. March 30, 1981); *see also Marsh v. Michigan Department of Corrections*, No. 80–11531–CZ (Marquette Cir.Ct. Aug. 19, 1980).

A section 1983 claim adjudicated in federal court may be the only means of conclusively determining the correct interpretation of the Administrative Rule and the Policy Directive.  The course of the litigation in the Marquette Circuit Court indicates that the Department of Corrections may be committed to a policy of preventing state appellate court adjudication of the controversy.  The Department's strategy apparently has been to enforce its Policy Directive despite court orders from the Marquette Circuit Court.  Thus, a prisoner must litigate every time he wants to receive a book from a source other than a publisher.

The Marquette Circuit Court's contempt citations have been directed at the Department of Corrections rather than individual

---

[1]. We believe the district court misconstrued Spruytte's complaint.  The court dismissed the complaint based on *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and *Young v. Johnson*, No. M78–38 CA (W.D.Mich. Jan. 27, 1981).  Those cases upheld publisher-only rules against first amendment attacks.  They are not applicable here because Spruytte claims that the state has no valid publisher-only rule.

officers. The court has been reluctant to cite the individual officers because they are operating under the Department's Policy Directive. Of course, the court cannot incarcerate the Department of Corrections and a fine is ineffective because the result would be mere transfer of funds from one state agency to another. Because the Marquette Circuit Court is without an effective remedy, the Department of Corrections has chosen to ignore the circuit court orders. To insulate its actions from review by the state's appellate courts, the Department refuses to appeal the circuit court's contempt citations, despite the pleas of the circuit judge: "I strongly suggest to the Department that they either appeal this present order, in order that the relationship between the Policy Directive and the Administrative Rule can be clarified, or initiate procedures under the Administrative Procedure Act to have an amendment to the Administrative Code rule.... If such an amendment is not that vital [to the order or security of the prison], the defendant Department should honor this and the prior orders of this court...." *Mithrandir v. Michigan Department of Corrections*, No. 11531, slip op. at 3 (Marquette Cir.Ct. Feb. 11, 1983).

We agree with Judge Quinnell that Policy Directive PD–BCF–63.03 is without legal effect under Michigan law. The starting point of our analysis is the legislation from which the Department of Corrections draws its authority to issue rules. The relevant statute provides:

> The director shall promulgate rules pursuant to Act No. 306 of the Public Acts of 1969, as amended, being sections 24.-201 to 24.315 of the Michigan Complied Laws, which shall provide:

> .    .    .    .    .

> (d) For the management and control of state penal institutions....

M.C.L.A. § 791.206. The quoted language "contains a clear legal mandate for the Commission to promulgate rules." *Lundberg v. Corrections Commission*, 57 Mich. App. 327, 330, 225 N.W.2d 752, 753 (1975).

The Department of Corrections is an agency that is subject to the rule promulgation requirements of Michigan's Administrative Procedure Act. *Human Rights Party v. Michigan Corrections Commission*, 76 Mich.App. 204, 256 N.W.2d 439 (1977). The quoted language from M.C.L.A. § 791.206 makes very certain that the rules adopted by the Department must be promulgated pursuant to Michigan's Administrative Procedure Act, M.C.L.A. § 24.-201 *et seq.* The APA sets out detailed procedures by which an agency may adopt rules. *See, e.g.*, M.C.L.A. §§ 24.241 and 24.242. A rule that does not comply with the procedural requirements of the APA is invalid under Michigan law. *See* M.C.L.A. §§ 24.243 and 24.245.

Agency compliance with the provisions of the APA is particularly important because all proposed rules are subject to the approval of the Michigan legislature. A proposed rule must be submitted to a legislative joint committee on administrative rules. *See* M.C.L.A. § 24.245(2). If the joint committee disapproves the proposed rule or is at an impasse after two months of consideration, the agency may not adopt the rule unless it is subsequently approved by a concurrent resolution of the legislature or by further action of the joint committee. *See* M.C.L.A. § 24.245(6). Thus, the question whether the Policy Directive may be adopted without compliance with the APA is more than a mere question of notice and hearing requirements; it is a question of the allocation of decisionmaking authority.

It is undisputed that the Policy Directive at issue here was not issued pursuant to the requirements for promulgation of an agency rule. The Policy Directive may be valid, therefore, only if it is not a "rule" within the meaning of the APA. The APA adopts the following definition:

> "Rule" means an agency regulation, statement, standard, policy, ruling or instruction of general applicability, which implements or applies law enforced or

administered by the agency ... but does not include the following:

.   .   .   .   .

(g) An intergovernmental, interagency or intraagency memorandum, directive or communication which does not affect the rights of, or procedures and practices available to, the public.

(h) A form with instructions, an interpretive statement, a guideline, an informational pamphlet or other material which in itself does not have the force and effect of law but is merely explanatory.

.   .   .   .   .

M.C.L.A. § 24.207.

Policy Directive PD–BCF–63.03 does not fall within the exception provided by M.C.L.A. § 24.207(g). That exception applies only when the agency's directive "does not affect the rights of ... the public." The rights of the public are affected by Policy Directive PD–BCF–63.03. In the absence of the Policy Directive, Spruytte's mother would have the right to send a non-threatening paperback dictionary to her son. The Policy Directive purports to take that right from her.

In *Schinzel v. Department of Corrections*, 124 Mich.App. 217, 333 N.W.2d 519 (1983) (per curiam), the court invalidated a policy directive that prohibited inmates' receipt of postage stamps through the mail. Prison officials argued that the policy affected only the rights of the inmates, not those of the public, and therefore the rule promulgation requirements of the APA were inapplicable. *Id.* at 219, 333 N.W.2d at 519–20. Without deciding whether inmates are members of the public, *id.* at 219 n. 1, 333 N.W.2d at 520 n. 1, the court held that the policy "den[ied] members of the general public their legal right to send postage stamps to inmates." *Id.* at 219, 333 N.W.2d at 520. The court invalidated the policy directive because "it affects the rights and practices available to the public; it must be promulgated as a rule under the proper procedures set out by the APA." *Id.* at 220, 333 N.W.2d at 520; *see also*

*Schinzel v. Marquette Prison Warden*, 123 Mich.App. 763, 765, 333 N.W.2d 348, 349 (1983), *modified*, 419 Mich. 865, 348 N.W.2d 5 (1984) (prison could not adopt a policy directive limiting amount of legal materials prisoner could transfer to new prison because "[t]he rulemaking procedures of the [APA] may not be circumvented.") The facts of this case are squarely within the holding in *Schinzel v. Department of Corrections*, 124 Mich.App. 217, 333 N.W.2d 519 (1983) (per curiam); the Policy Directive is not within the exception provided by M.C.L.A. § 24.207(g).

We also conclude that the Policy Directive is not an "interpretive statement" exempt from the rule promulgation requirements by virtue of M.C.L.A. § 24.207(h). The Policy Directive conflicts with Administrative Rule 791.6603(3), the Rule the Directive purports to interpret. As Judge Quinnell noted in *Mithrandir v. Michigan Department of Corrections*, No. 11531 (Marquette Cir.Ct. Feb. 11, 1983), on its face the Administrative Rule confers on prisoners the right to receive *any* publication that does not threaten the security of the prison.

In *Mithrandir* the Department argued that the Policy Directive creates a category of books—those not sent by publishers—that, as a class, threaten the security of the prison. According to that argument, the Policy Directive is a legitimate interpretation, not a contradiction, of the Administrative Rule. That position is untenable for several reasons.

First, the exception created by the Policy Directive is simply too broad to be deemed an interpretation of the Administrative Rule. The Rule entitles prisoners to receive *any* publication that is not threatening to security. The affirmative and expansive language of the Rule is incompatible with an exception that would see a prisoner's right to receive books constricted to the degree contemplated by a publisher-only rule.

Second, publisher-only rules are not uncommon among state and federal prison regulations. *See, e.g., Bell v. Wolfish*, 441

U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Zaczek v. Hutto,* 642 F.2d 74 (4th Cir.1981); *Cotton v. Lockhart,* 620 F.2d 670 (8th Cir.1980). If the drafters of the Administrative Rule had intended to adopt a publisher-only rule they did not lack illustrative models. Additionally, the brevity and precision of the Policy Directive indicate that the drafting of a publisher-only rule is not a difficult task. In the face of available illustrative models and an uncomplicated task, the drafters of the Administrative Rule produced a regulation that permits a prisoner to receive "any book, periodical or other publication" unless the book poses a threat to security. The language of the Administrative Rule does not so much as hint at adoption of a publisher-only rule. The unavoidable inference is that the drafters of the Rule rejected adoption of a publisher-only limitation. A Policy Directive that would read such a restriction back into the administrative scheme is not a proper interpretation of the Administrative Rule.

Third, the text of the Administrative Rule demonstrates that a prisoner is entitled to receive a book unless prison officials make a determination that the individual book threatens security, not that the book belongs to a category of books that may threaten security. The requirement of an individualized determination is evident when we look beyond the limited portion of Administrative Rule 719.6603(3) which we have considered thus far and examine the Rule in its entirety. The full text of subsection (3) provides:

> *There is no limit on the amount of incoming mail a resident may receive.* Incoming mail from other correctional facilities may be read, and *all incoming mail shall be opened and inspected for money and contraband* prior to delivery to the addressee. The department shall follow the guidelines of the auditor general for receiving and safe handling of money and valuables confiscated from incoming mail. A resident may receive any book, periodical, or other publication which does not present a threat to the order or security of the institution or to resident rehabilitation.

(emphasis added).

A Policy Directive that purports to restrict prisoners' access to an entire category of publications is not a legitimate interpretation of a Rule that by its terms requires officials to determine that an *individual* book poses a threat to security. The means adopted—individualized inspection—applies to "all incoming mail," not just personal correspondence.

Finally, the Supreme Court has held that the purpose of a publisher-only rule is to reduce "the administrative difficulties posed by the necessity of carefully inspecting each book mailed from unidentified sources." *Bell v. Wolfish,* 441 U.S. 520, 551, 99 S.Ct. 1861, 1880, 60 L.Ed.2d 447 (1979). The publisher-only rule of Policy Directive PD–BCF–63.03 is an administrative technique that is designed to obviate the need for "carefully inspecting each book," but such careful inspection is precisely what is mandated by Administrative Rule 791.6603(3). Therefore, the Policy Directive does not fall within M.C.L.A. § 24.-207(h).[2]

■ Our conclusion that the Policy Directive falls within the exception of neither M.C.L.A. § 24.207(g) nor M.C.L.A. § 24.-207(h) is fully supported by a review of the decisions of the Michigan courts. They have shown a strong tendency to require agencies to act pursuant to formal rules rather than through informal policies. *See, e.g., Schinzel v. Marquette Prison Ward-*

---

2. The Policy Directive also is not a valid "guideline" as defined in M.C.L.A. § 24.203(6). The Department's substantive grant of authority, M.C.L.A. § 791.206, provides that the Director "shall promulgate *rules* ... which shall provide: ... (d) For the management and control of state penal institutions." (emphasis added). The APA itself provides, "An agency shall not adopt a guideline in lieu of a rule." M.C.L.A. § 24.-226. Because the substantive grant of authority provides that the Director must act pursuant to rule, the Policy Directive may not be implemented as a guideline. *Williams v. Warden, Michigan Reformatory,* 88 Mich.App. 782, 785, 279 N.W.2d 313, 314–15 (1979).

*en,* 123 Mich.App. 763, 765, 333 N.W.2d 348, 349 (1983), *modified,* 419 Mich. 865, 348 N.W.2d 5 (1984) (prison policy of limiting amount of legal materials prisoner may transfer to new prison must be implemented by rule); *Williams v. Warden, Michigan Reformatory,* 88 Mich.App. 782, 786, 279 N.W.2d 313, 314–15 (1979) (prison policy providing for forfeiture of good-time credits must be implemented by rule); *Lundberg v. Corrections Commission,* 57 Mich.App. 327, 330, 225 N.W.2d 752, 753 (1975) (issuing writ of mandamus to require prison officials to promulgate rules). When an agency is required to act pursuant to a rule but has failed to do so, the agency is wholly without legal authority to act. *Williams, supra,* 88 Mich.App. at 786, 279 N.W.2d at 315; *Jerome v. Crime Victims Compensation Board,* 119 Mich. App. 648, 651–52, 326 N.W.2d 593, 596 (1982) ("Without full compliance with [the APA], there is no rule and no authority to act."). Because Policy Directive PD–BCF–63.03 was neither promulgated pursuant to nor exempted from the procedures established by the APA, it is without legal authority or effect under Michigan law.

■ To this point, all we have determined is that Policy Directive PD–BCF–63.03 is invalid as a matter of state law. The next step in our inquiry is a determination whether state law grants Spruytte a right to receive the dictionary. We conclude that it does.

With the Policy Directive having no legal effect, we are left with Administrative Rule 791.6603(3). As noted, that Rule grants a prisoner the right to receive any publication that does not threaten prison security or resident rehabilitation. The Rule further provides that the determination of whether a publication is threatening is to be made after an individualized inspection of the publication. It is clear that, as a matter of state law, Spruytte had a right to receive a non-threatening publication.

■ We must now consider whether Spruytte's state-law right to receive a non-threatening book rises to the level of a property interest protected by the due process clause of the fourteenth amendment to the United States Constitution. The starting point for this analysis is *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972):

> [T]he property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process.

*Id.* at 571–72, 92 S.Ct. at 2706. Spruytte's claim that he is entitled to receive the dictionary may be plausibly cast as an assertion of either a property interest or a liberty interest. On the one hand, his claim is that he is entitled to possess a tangible object. That claim invokes traditional notions of property rights.[3] On the other hand, Spruytte's claim is that, while in prison, he is entitled to receive a book that concededly he could possess were he not incarcerated. That claim may implicate liberty interests. Whether cast as a property interest or a liberty interest, the type of interest claimed by Spruytte is well within the range of interests that are protected under the fourteenth amendment. The analysis for determining whether the state law has granted a protected property interest parallels the analysis for determining whether state law has granted a liberty interest. *See Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); *Walker v. Hughes,* 558 F.2d 1247, 1255 (6th Cir.1977).

■ A mere expectation of receiving a benefit is not enough to create a protected interest. A person who claims an interest

---

**3.** The dictionary was addressed to Spruytte and was received by officials at the mail office at the Marquette Branch Prison. Items sent through the mail generally are subject to the control of the addressee after they have been delivered at the appropriate address. *See Rhode Island Tool Co. v. United States,* 128 F.Supp. 417, 419, 130 Ct.Cl. 698 (1955); U.S.P.S. Domestic Mail Manual § 153.11(a) (1984).

in a benefit must "have a legitimate claim of entitlement to it." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. One source of "legitimate entitlements" is state law. *Id.* But not every state law right gives rise to an entitlement. The current law on entitlements is stated in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and *Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983).

In *Hewitt* the Court found that Pennsylvania's regulatory framework governing administrative segregation gave prisoners a protected liberty interest in remaining in the general prison population. *Hewitt,* 459 U.S. at 470–71, 103 S.Ct. 870–71. The regulations in question provided that a prisoner could not be removed from the general population unless officials found that "the need for control" or "a threat of a serious disturbance" required removal of the prisoner. *Id.* at 471–72 & 470 n. 6, 103 S.Ct. at 871–72 & 871 n. 6. The Court held that these "specific substantive predicates" to removal of a prisoner, in conjunction with the use of language in the regulations that certain procedures "must" and "shall" be used in determining whether the substantive predicates exist, created a protected interest. *Id.* at 472, 103 S.Ct. at 871.

In *Olim* the Court held that Hawaii's regulations governing transfers of prisoners to other institutions did not give prisoners a protected interest in not being transferred to the United States mainland. *Olim,* 461 U.S. at 249, 103 S.Ct. at 1747. The regulations did not create a protected interest because they placed "no substantive limitations on official discretion." *Id.* Additionally, the Supreme Court of Hawaii previously had held that the officials' discretion to transfer an inmate was "completely unfettered" by the regulations. *Id.* (citing *Lono v. Ariyoshi,* 63 Haw. 138, 144–45, 621 P.2d 976, 980–81 (1981)).

We note and respect the dicta in *Hewitt* and *Olim* that warn against unwarranted federal court intervention in the general administrative control of state prisons. Yet the relationship between the federal courts and state prison administration is determined by the fundamental relationship between the federal courts and the state prisoner's federal constitutional rights. That fundamental relationship was stated in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974):

> But though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protection when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country.

*Id.* at 555–56, 94 S.Ct. at 2974. To determine the constitutional protection to which a state prisoner is entitled requires that we search through the "atmospherics" of *Hewitt* and *Olim* and discover the legal criteria by which our determination should be guided. *Lucas v. Hodges,* 730 F.2d 1493, 1503 (D.C.Cir.1984). *Hewitt* and *Olim* provide us with a sole criterion to determine whether prison regulations create a federally protected interest.

> [A] state creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show "that particularized standards or criteria guide the State's decisionmakers."

*Olim,* 461 U.S. at 249, 103 S.Ct. at 1747 (quoting *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 2466, 69 L.Ed.2d 158 (1981) (*Brennan,* J., concurring)).

Applying this criterion to the present case, we find that Administrative Rule 791.6603 creates a federally protected interest. The Rule states that a prisoner "may receive any book ... which does not present a threat to the order or security of the institution or to resident rehabilitation." If a prisoner may receive any non-threatening book, it follows that officials may not prohibit receipt of a book unless they determine that the book poses a threat to the administration of the prison. The Rule also provides that the individual book must pose a threat, not that the book merely belong to a category of books that may

pose a threat. Thus, a finding that an individual book "present[s] a threat to the order or security of the institution or to resident rehabilitation" is a specific substantive predicate to withholding of the book from the prisoner. Because specific, substantive criteria restrict officials' discretion, the Rule creates a federally protected interest.[4]

Having found that Spruytte had a federally protected interest in receiving the paperback dictionary from his mother, it must now be determined whether the state used adequate procedures to defeat that interest. In their brief the defendants do not assert that they made a determination that the dictionary sent to Spruytte posed a threat to security. Instead, they admit, "The Defendants in this case applied and enforced a publisher only rule with respect to a package intended for Plaintiff." This admission alone establishes that the defendants violated Spruytte's due process right to receive a paperback dictionary from his mother.[5]

■ The procedural requirements demanded by due process are determined as a matter of federal law. *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). In the usual case, we must determine whether a claimant is entitled to notice, an opportunity to be heard, cross-examination, the assistance of counsel, and the like. These procedural rights help to guarantee that the dispute resolution process will achieve a fair and accurate result and thus minimize the risk of "substantial-

ly unfair or mistaken deprivations" of protected interests. *Fuentes v. Shevin,* 407 U.S. 67, 97, 92 S.Ct. 1983, 2002, 32 L.Ed.2d 556 (1972); *see Morrissey v. Brewer,* 408 U.S. 471, 496, 92 S.Ct. 2593, 2608, 33 L.Ed.2d 484 (1972). An accurate result is important because, "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974).

■ The right that was denied Spruytte is one that is fundamental to procedural regularity. He was denied the right to require the state to *make a determination* based on legally relevant criteria. Administrative Rule 791.6603(3) provides that officials may not prohibit a prisoner's receipt of a book unless they conclude that it poses a threat to security. In this case officials in fact prohibited Spruytte's receipt of a book even though they did not make a finding that the book posed a threat to security. The due process violation is not that the officials' finding was erroneous, but that they did not make any relevant finding.

■ True, the state's failure to comply with its own procedural requirements is not *in itself* a violation of due process. *See Bills v. Henderson,* 631 F.2d 1287, 1296–98 (6th Cir.1980). We conclude, however, that when a state creates an entitlement and provides that it may not be defeated except upon a finding of a specific substantive predicate, the state's defeat of that entitlement without making such a finding is a

---

**4.** Protected interests previously have been found in cases where the substantive criterion restricted officials' discretion far less than does the criterion before us. A protected interest was found where a prisoner could not be subjected to loss of privileges unless officials found that he had engaged in "major misconduct." *See Walker v. Hughes,* 558 F.2d 1247, 1256 & n. 9 (6th Cir.1977). In *Bills v. Henderson,* 631 F.2d 1287 (6th Cir.1980), a protected interest was found where a prison regulation provided that the purpose of administrative segregation was to "promote and maintain order." *Id.* at 1292–93.

**5.** Spruytte's *pro se* complaint also alleges that the procedures used were defective because he

did not receive notice of the date or time of the hearing; he was not given a copy of any policy directive on which the officials would rely at the hearing; his staff assistant refused to obtain a copy of a dispositive state court ruling; the hearing was not adjourned to allow him to obtain a copy of the ruling; officials at the hearing deliberately disregarded an applicable Administrative Regulation; officials deliberately disregarded an applicable state court decision; officials took these actions in retaliation for Spruytte's exercise of his first amendment rights and his activities in helping other prisoners gain access to the courts; and officials withdrew monies from his account unlawfully and without his permission.

violation of due process. Indeed, it would be anomalous to conclude that federal courts may impose on states procedures that are designed to enhance the accuracy of factual findings but then conclude that federal courts may not require that the factual findings be made. Our conclusion is well supported in the case law.

In *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960), Thompson was arrested for loitering and disorderly conduct when he was in a cafe waiting for a bus. He was fined $10 on each charge. *Id.* at 202, 80 S.Ct. at 627. At trial and on appeal Thompson alleged that the convictions, because they were not based on any evidence, constituted a deprivation of property and liberty without due process. *Id.* at 200, 80 S.Ct. at 625. The court found that the record contained no evidence that Thompson's actions came within the city's definition of "loitering" or "disorderly conduct." *Id.* at 204–06, 80 S.Ct. at 628–29. Because the city provided no evidence that Thompson's activities came within the relevant legal criteria, the conviction of Thompson was a denial of due process. *Id.* at 206, 80 S.Ct. at 629. *Cf. Vachon v. New Hampshire*, 414 U.S. 478, 94 S.Ct. 664, 38 L.Ed.2d 666 (1974).

In the criminal context, the doctrine of *Thompson* has been displaced in part by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *Thompson* retains its force in civil actions in which the state provides that an interest may be defeated only upon a finding of specific substantive predicates. The doctrine of *Thompson* is well suited to civil actions alleging violations of due process under section 1983. In *Thompson* itself the defendant alleged that the conviction constituted a deprivation of property as well as liberty, *Thompson*, 362 U.S. at 200, 80 S.Ct. at 625, and all that was at stake was $20 in fines. *Id.* at 202, 80 S.Ct. at 627. Many courts have applied *Thompson* in civil cases to require that the state support its decision with substantial evidence. *See Strickland v. Inlow*, 485 F.2d 186, 190 (8th Cir.1973), *vacated on other grounds sub nom. Wood v. Strickland*, 420 U.S. 308,

323, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975); *Sostre v. McGinnis*, 442 F.2d 178, 198–99 (2d Cir.1971) (en banc), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972); *Jones v. Latexo Independent School District*, 499 F.Supp. 223, 239 (E.D. Tex.1980); *Kucinich v. Forbes*, 432 F.Supp. 1101, 1116 (N.D.Ohio 1977); *Papish v. Board of Curators*, 331 F.Supp. 1321, 1323 n. 1 (W.D.Mo.1971). A fair, yet more narrow, reading of *Thompson* requires that the state at least make the finding required by its substantive law. Because the state officials deprived Spruytte of his dictionary without first making a determination that the book posed a threat to security, the officials violated Spruytte's due process rights. *Cf. Wolff v. McDonnell*, 418 U.S. 539, 565, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1974) (requirement of a written record helps ensure that officials will act fairly); *Goldberg v. Kelly*, 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970) ("the decision maker should state the reasons for his determination and indicate the evidence he relied on").

■■■ Next, the defendants argue Spruytte may not prevail on a claim premised on due process because state post-deprivation procedures are adequate to redress any loss that Spruytte suffered. It is true that a plaintiff who alleges an infringement of property rights generally must show that state remedies are inadequate. *Hudson v. Palmer*, — U.S. —, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Vicory v. Walton*, 721 F.2d 1062 (6th Cir.1983), *cert. denied*, — U.S., —, 105 S.Ct. 125, 83 L.Ed.2d 67 (1984). That rule is inapplicable, however, when "a deprivation of property is caused by conduct pursuant to established state procedure, rather than random and unauthorized action." *Hudson v. Palmer*, 104 S.Ct. at 3203; *see Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982); *Lee v. Western Reserve Psychiatric Habilitation*

*Center,* 747 F.2d 1062, 1068 (6th Cir.1984). *Cf. Monroe v. Pape,* 365 U.S. 167, 235, 81 S.Ct. 473, 510, 5 L.Ed.2d 492 (1961) (Frankfurter, J., dissenting) (section 1983 provides cause of action for "deprivations of federal rights under color of any 'statute, ordinance, regulation, *custom or usage*' of a State") (emphasis supplied by Justice Frankfurter). The deprivation of Spruytte's property resulted from application of a policy directive adopted by the Department of Corrections. Policy Directive PD–DWA–13.01 provides that a policy directive "is the formal statement of the Department's policy on a given subject." Further, it is a matter of public record that the Department in fact has applied Policy Directive PD–BCF–63.03 to defeat prisoners' protected interests, has willfully, systematically refused to follow state law, and has been held in contempt of court for doing so. *See Mithrandir v. Michigan Department of Corrections,* No. 11531, slip op. at 4 (Marquette Cir.Ct. Feb. 11, 1983); *Mithrandir v. Michigan Department of Corrections,* No. 11531, (Marquette Cir.Ct. Nov. 5, 1981); *Marsh v. Michigan Department of Corrections,* No. 11531, slip op. at 4 (Marquette Cir.Ct. March 30, 1981); *see also Marsh v. Michigan Department of Corrections,* No. 80–11531–CZ (Marquette Cir.Ct. August 19, 1980). The deprivation of Spruytte's protected interest was "caused by conduct pursuant to established state procedure." *See Hudson v. Palmer,* 104 S.Ct. at 3203. Thus, the adequacy of state post-deprivation procedures is irrelevant.

■ Next, the district court held that the prison officials are entitled to immunity even if they violated Spruytte's constitutional rights. Certainly, administrative officials are entitled to qualified immunity under certain circumstances. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This immunity would extend to supervisory prison officials, *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), and to prison officials who conduct administrative hearings, *Jihaad v. O'Brien,* 645 F.2d 556, 564 (6th Cir.1981). An official is im-

mune unless the conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. An official is not entitled to immunity from actions seeking only injunctive or declaratory relief. *Id.* at 806, 102 S.Ct. at 2732; *Davis v. Scherer,* —— U.S. ——, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984).

■ There can be no question the prison officials here violated a clearly established state regulation. Administrative Rule 791.6603 was promulgated years before the June 10, 1982 hearing. Of the four cases in the *Mithrandir* series, three were decided prior to the hearing. Moreover, cases such as *Williams v. Warden, Michigan Reformatory,* 88 Mich.App. 782, 279 N.W.2d 313 (1979), and *Lundberg v. Corrections Commission,* 57 Mich.App. 327, 225 N.W.2d 752 (1975), gave officials ample notice that they were required to act pursuant to administrative rule.

The Supreme Court has determined that violation of a clearly established state regulation is sufficient to cause officials to forfeit their qualified immunity. In *Davis v. Scherer,* —— U.S. ——, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), a former state official, suing under section 1983, alleged that state officials violated due process by discharging him without a pre-termination hearing. The officials' refusal to grant a pre-termination hearing was a violation of an applicable state regulation. *Id.* 104 S.Ct. at 3017. The Court held, however, that the violation of the regulation did not revoke the immunity available to the officials. *Id.* 104 S.Ct. at 3020. "Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates *some* statutory or administrative provision." *Id.* (emphasis added).

In *Scherer* the regulation that was violated was unrelated to Scherer's underlying section 1983 claim. As the Court carefully noted, "Appellee does not contend here that the procedural rules in state law govern the constitutional analysis of what pro-

cess was due him under the Fourteenth Amendment." *Id.* 104 S.Ct. at 3019 n. 11. Indeed, because federal law determines what process is due, *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the violation of the state regulation in *Scherer* did not "bear upon the claim of constitutional right that appellee asserts under § 1983." *Scherer,* 104 S.Ct. at 3019. The Court held that state officials lose their immunity if they violate a state regulation that "provides the basis for the cause of action sued upon." *Id.* 104 S.Ct. at 3020 n. 12. The critical distinction, then, is between violation of regulations that "bear upon the claim of constitutional right" and those that do not. .

In *Scherer* the Court noted, "State law may bear upon a claim under the due process clause when the property interests protected by the Fourteenth Amendment are created by state law. *See Board of Regents v. Roth,* [408 U.S. 564], 577 [92 S.Ct. 2701, 2709, 33 L.Ed.2d 548] [ (1972) ]." *Scherer,* 104 S.Ct. at 3019 n. 11. Thus, in the context of a violation of due process, the critical distinction between regulations that bear upon the constitutional right and those that do not is collapsed into the distinction between regulations that give rise to the protected interest and regulations that merely provide what process is due once a protected interest has been found. The latter distinction is consistent with a goal of preserving official immunity when the official violates a regulation that is "irrelevant to the merits of [the] underlying constitutional claim." *Scherer,* 104 S.Ct. at 3018. Violation of a state regulation that defines specific substantive predicates becomes relevant because state law determines whether a claimant has a protected interest. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

In *Scherer* the claimant did not allege that state officials failed to abide by the substantive criteria by which the decision whether to discharge him was to be made; he merely alleged that officials violated a regulation that specified the procedures to be used in making the substantive determi-

nation. By contrast, the officials here violated Administrative Rule 791.6603(3), the very rule that creates a protected interest and defines the criteria that must be fulfilled before the interest may be defeated. Because the officials violated that rule and the rule was clearly established at the time of the violation, the officials are not entitled to immunity.

■ Finally, the defendants argue that the eleventh amendment prevents a federal court from ordering relief in this case. We disagree. The eleventh amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State....

The amendment has been construed to prohibit suits against a state brought by its own citizens as well as those brought by citizens of another state. *See Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Our only task is to determine whether Spruytte's suit is one "commenced or prosecuted against one of the United States."

*Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), is the foundation for determining whether a claimant may maintain a federal court action for damages against state officials in their individual capacities when the claim alleges a constitutional violation. The Court in *Scheuer* stated that "damages against individual defendants are a permissible remedy in some circumstances notwithstanding the fact that they hold public office." *Id.* at 238, 94 S.Ct. at 1687. The holding was based upon the fiction of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which the *Scheuer* Court explained:

> Ex parte Young teaches that when a state officer acts under a state law in a manner violative of the Constitution, he 'comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subject-

ed *in his person* to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.' *Scheuer,* 416 U.S. at 237, 94 S.Ct. at 1687 (quoting *Ex parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 453–54, 52 L.Ed. 714 (1908)) (emphasis supplied by the *Scheuer* Court). The *Scheuer* Courts reasoning that the eleventh amendment does not bar an action for money damages against a state official in an individual capacity is consistent with the case law on whether an action is one "against one of the United States." An action is one against a state, and is therefore barred by the eleventh amendment, only if the relief requested would "expend itself on the public treasury." *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) (quoting *Land v. Dollar,* 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947)); *see Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). *Cf. Stafford v. Briggs,* 444 U.S. 527, 542 n. 10, 100 S.Ct. 774, 784 n. 10, 63 L.Ed.2d 1 (1980) (whether action is one against the government is determined by asking "who will pay the judgment?").

A money judgment against state officials in their individual capacities would not be paid from the public treasury.[6] Spruytte's claim against the prison officials in their individual capacities therefore is not barred by the eleventh amendment. Spruytte's claim against the officials in their official capacities, however, is barred because any monetary relief afforded would be paid from public funds. *See Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

Our conclusion that Spruytte may maintain his action against state officials in their individual capacities is not altered by *Pennhurst State School & Hospital v. Halderman,* — U.S. —, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). One sentence in *Pennhurst* states, "Under *Edelman v. Jordan,* [415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)], a suit against state officials for retroactive monetary relief, whether based on federal or state law, must be brought in state court." *Pennhurst,* 104 S.Ct. at 920. A correct interpretation of this quoted language requires some discussion of *Pennhurst* and *Edelman.*

The plaintiffs in *Pennhurst* sought a federal-court injunction that would prevent state officials from violating state law. *Pennhurst,* 104 S.Ct. at 903–06. State officials claimed that the requested relief would violate the eleventh amendment. *Id.* 104 S.Ct. at 906. The Court began its analysis by noting that the action was one against the state because the relief requested, an injunction, would operate against the state. *Id.* 104 S.Ct. at 908 & n. 11. The Court observed that, even if the action is one against the state, the fiction of *Ex parte Young* permits the action to proceed in federal court if the plaintiff raises a constitutional claim. *Id.* 104 S.Ct. at 909. Finally, the Court held that the fiction of *Ex parte Young* may not be applied when, as in *Pennhurst,* the claim made is that state officials violated state rather than federal law. *Id.* 104 S.Ct. at 911.

This analysis demonstrates that the Court did not intend to bar federal court suits against state officials in their individual capacities. *Pennhurst* merely created a bar to federal court actions against state officials in those cases in which two conditions are met: (1) the claim is based on state rather than federal law, and (2) the action is otherwise one against the state. *Pennhurst's* ban on federal court actions is dependent on fullfillment of the latter condition. The analysis began by describing the criteria relevant to whether an action is one against the state and noting that the

---

**6.** A government may not manufacture immunity for its employees by agreeing to indemnify them. *Demery v. Kupperman,* 735 F.2d 1139, 1146–47 (9th Cir.1984); *Foster v. Day & Zimmer-* *mann, Inc.,* 502 F.2d 867, 875 (8th Cir.1974); L. Tribe, American Constitutional Law 133 n. 22 (1978).

plaintiffs conceded that theirs was such an action. *Pennhurst,* 104 S.Ct. at 908 & n. 11. This part of the Court's analysis is superfluous if the Court intended to establish the source of law, state or federal, as the sole measure of the propriety of a federal court action. Thus, the analysis in *Pennhurst* gives no credence to a literal reading of the statement that "a suit against state officials for retroactive monetary relief, whether based on federal or state law, must be brought in state court." *Id.* 104 S.Ct. at 920; *see also Tate v. Frey,* 735 F.2d 986, 989 (6th Cir.1984) (per curiam) ("In *Pennhurst,* the Supreme Court concluded that a federal suit against state officials founded in state law contravenes the Eleventh Amendment *where the relief sought and ordered impacts directly on the state itself*") (emphasis added).

Further, the analysis in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the foundation upon which the language in *Pennhurst* was based, dispels any notion that *Pennhurst* meant to prevent suits against state officials in their individual capacities. In *Edelman* the plaintiffs alleged that state officials had withheld public assistance payments in violation of federal law. *Id.* at 653, 94 S.Ct. at 1351. The plaintiffs sought an injunction to require officials to grant wrongfully withheld benefits and to conform to federal law their future conduct. *Id.* at 653, 656, 94 S.Ct. at 1351, 1352. The prospective relief requested was not prohibited by the eleventh amendment. *Id.* at 664, 94 S.Ct. at 1356. Any monetary loss incurred by the state's adherence to a prospective injunction was "a permissible and often an inevitable consequence of the principle announced in *Ex parte Young." Edelman,* 415 U.S. at 668, 94 S.Ct. at 1358; *see also Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

With respect to the claim for retroactive monetary relief, the Court noted that although the plaintiffs cast their claim as one for an injunction, "it is in practical effect indistinguishable in many aspects from an award of damages against the State. It will to a virtual certainty be paid from state funds, and not from the pockets of the individual state officials who were the defendants in the action." *Edelman,* 415 U.S. at 668, 94 S.Ct. at 1358. Because the claim sought money damages from the state, it was barred by the eleventh amendment. *Id.* at 671, 94 S.Ct. at 1359. Thus, "Under *Edelman v. Jordan, supra,* a suit against state officials for retroactive monetary relief, whether based on federal or state law, must be brought in state court." *Pennhurst,* 104 S.Ct. at 920. The holding in *Edelman,* however, like that in *Pennhurst,* is limited to cases in which the relief sought would "expend itself on the public treasury." *Dugan v. Rank,* 372 U.S. at 620, 83 S.Ct. at 1006. *Pennhurst* must be interpreted to mean that suits seeking money damages that are nominally against state officials, but that are in fact against the state, must be brought in state courts.

Support for the argument we advance is found in *Demery v. Kupperman,* 735 F.2d 1139 (9th Cir.1984), which held that, "Neither *Edelman* nor *Pennhurst II* changes the well-settled rule that the eleventh amendment does not bar suits seeking damages for violation of federal law from state officials personally." *Id.* at 1150. *Pennhurst* neither discussed section 1983, which provides a cause of action against "every person" who under color of state law violates federal rights, not overruled *Scheuer v. Rhodes, supra,* which held that the eleventh amendment does not bar actions against state officials in their individual capacities. *Demery,* 735 F.2d at 1150. The court concluded:

Because an interpretation of the *Pennhurst II* language that is consistent with both *Scheuer v. Rhodes* and decades of section 1983 jurisprudence is available, we decline to interpret *Pennhurst II* as having effectuated such a radical change in the established law of civil rights.

*Id.; see also Banas v. Dempsey,* 742 F.2d 277, 284 n. 10 (6th Cir.1984) ("The Eleventh Amendment does not bar actions for money damages arising from constitutional torts committed by state officials who are then sued in their individual capacities in federal

court.") We agree, and also note that *Davis v. Scherer,* — U.S. —, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), was decided subsequent to *Pennhurst.* The *Scherer* Court held that state officials sued for money damages in their individual capacities in federal court under section 1983 did not forfeit their qualified immunity by violating a state regulation. Such a holding was unnecessary if one takes literally the statement in *Pennhurst* that "a suit against state officials for retroactive monetary relief ... must be brought in state court."

That finally brings us to the prison officials' claim that the eleventh amendment bars Spruytte's claim for declaratory and injunctive relief. *Edelman v. Jordan, supra,* clearly permits a federal court to award prospective injunctive relief against state officials when the claim is based on federal law. *Edelman,* 415 U.S. at 664, 94 S.Ct. at 1356; *see Lee v. Western Reserve Psychiatric Habilitation Center,* 747 F.2d 1062, 1066 (6th Cir.1984). If the officials are to prevail in their defense, it must be because Spruytte's claim is in essence a state-law claim and therefore barred by *Pennhurst.*

Although Spruytte's claim requires us to consider issues of state law, it does not follow that his claim is barred by *Pennhurst.* Spruytte's complaint alleges a violation of his *federal* constitutional rights. We decline to endorse the proposition that officials may undermine federal court authority by violating state as well as federal law. Even in *Pennhurst* the Court remanded the case to determine whether the state officials' conduct, the same conduct that formed the basis of the state-law claim, violated federal law. *Pennhurst,* 104 S.Ct. at 921. Moreover, subsequent to *Pennhurst* the Court entertained a section 1983 action that required a close analysis of a state statutory scheme. *See Davis v. Scherer, supra.*

The dismissal of the complaint is reversed and the case remanded for further proceedings consistent with this opinion.

Costs of this appeal are awarded to appellant.

WEICK, Senior Circuit Judge, concurring in part:

In my opinion, the district judge abused his discretion in his *sua sponte* dismissal of Spruytte's *in forma pauperis* complaint filed under 42 U.S.C. § 1983 without allowing service of the complaint on the defendants and permitting Spruytte to amend his complaint or respond to the court's notice of intent to dismiss. I would reverse the judgment of the district court and remand for trial.

I would prefer this treatment of the case rather than to resort to the lengthy opinion of my learned and industrious colleague which contains many facts which are not part of the record, most of which are undoubtedly true.