**James BRADFIELD, Individually and d/b/a Brad's Town Club, Plaintiff,**

v.

**Jack BLESMA, Individually and in his capacity as Police Chief of the Village of Elk Rapids, Defendant.**

**No. G84–470 CA7.**

United States District Court, W.D. Michigan, S.D.

Nov. 25, 1987.

---

Michael H. Dettmer, Traverse City, Mich., for plaintiff.

Dennis K. Taylor, Traverse City, Mich., for defendant.

## OPINION

HILLMAN, Chief Judge.

On May 7, 1984, plaintiff James Bradfield individually and as Brad's Town Club, filed a four count complaint against Jack Blesma individually and in his capacity as Police Chief of the Village of Elk Rapids. Plaintiff premised his suit on 42 U.S.C. §§ 1983 and 1988.

Plaintiff possesses a class C liquor license pursuant to which he operates Brad's Town Club in Elk Rapids, Michigan. In 1983, plaintiff applied for a permit that would have allowed live entertainment, including topless dancing, at Brad's Town Club. Issuance of that permit required the approval of the local police chief. On the basis of defendant Blesma's recommendation, the Michigan Liquor Control Commission ("LCC") denied plaintiff's application. Plaintiff claims that defendant did not approve the permit because "he wishes to unconstitutionally regulate topless dancing." (Plaintiff's Trial Brief at 1.) Specifically, plaintiff alleged that defendant's denial of a permit amounted to an impermissible prior restraint on plaintiff's right to free expression (count I), a denial of plaintiff's property without due process of law (count II), and an impermissible taking of plaintiff's property in the form of future income (count III). Plaintiff also sought attorney fees pursuant to Section 1988 (count IV).

On July 23, 1984, defendant filed a motion to dismiss counts II and III pursuant to Federal Rule of Civil Procedure 12(b)(6). I granted defendant's motion with respect to count III and denied it with respect to count II.

A two day bench trial on the remaining counts commenced on December 29, 1986. Michael Dettmer appeared for the plaintiff and Dennis Taylor appeared for defendant. The court heard seven witnesses and received 27 exhibits. Following trial the parties submitted seven depositions. Both parties also submitted post trial briefs.

The court, having listened to the arguments of counsel, heard the testimony, and considered all of the exhibits, enters the following finding of fact and conclusions of law.

*I. Findings of Fact.*

James Bradfield has owned and operated Brad's Town Club in Elk Rapids, Michigan, since 1966. He holds a class C liquor license issued by the Michigan Liquor Control Commission pursuant to the Michigan Liquor Control Act, M.C.L.A. § 436.1 *et seq.*

On January 27, 1983, a topless dancer performed five fifteen minute shows at Brad's Town Club. After that evening's performances, defendant told plaintiff that plaintiff had probably violated LCC rules requiring a permit for live entertainment. Plaintiff contacted Kenneth Swathwood, District Supervisor of the LCC, who informed Bradfield that if he allowed the topless dancer to perform again without obtaining the appropriate entertainment license, he would be in violation of state law and could be charged. (Swathwood Deposition at 7.) Nevertheless, plaintiff arranged for a second set of performances on January 28. Plaintiff was subsequently fined $400 for having violated Michigan Administrative Code R. 436.1407. Rule 7(1) specifically prohibits dancing or other performances for public viewing on licensed premises in the absence of an entertainment permit.

Plaintiff subsequently applied for an entertainment permit in February, 1983. At that time plaintiff's only LCC violation citations consisted of the two imposed as a result of the January performances. However, not all incidents requiring the attention of the police result in LCC violations, and the logs of the Elk Rapids Village police show that Brad's Town Club Bar has, over the years, been the site of more altercations requiring attention and investigation by the police than other bars in Elk Rapids.

Under M.C.L.A. § 436.1 *et seq.* and Michigan Administrative Code R. 436.1407, Rule 7(3), an entertainment permit cannot be issued to an on-premise liquor licensee without prior approval by the chief local law enforcement officer, the local legislative body, and the LCC. According to LCC officials who testified at trial and in deposition, the LCC will not override the recommended denial of an application by a local authority. The testimony of the state officials further established that the LCC has not promulgated or provided any guidelines for police officials to apply when exercising their discretion to approve or deny an entertainment permit. Neither does the LCC require the local law enforcement officer or the legislative body to state reasons for approval or denial. Finally, testimony at trial established that the LCC is not concerned with public safety or order other than as it might be reflected in LCC violations. (See also Plaintiff's Exhibit 26.)

As part of the permit application process, the LCC sent defendant Blesma a recommendation form which he was to fill out in his capacity as Chief of Police of Elk Rapids. The form provides no space for detailing the reasons that a permit is recommended or denied. Nevertheless, defendant typed at least a partial explanation of his decision onto the form. He stated that his failure to recommend that the permit be granted was based on plaintiff's "[f]ailure to cooperate with law enforcement officers or the Michigan Liquor Control Commission when told not to do the entertainment or dance entertainment." (Plaintiff's Exhibit 4.) Subsequently, in a letter dated May 5 1983, defendant recommended that the permit not be granted. (Plaintiff's Exhibit 7.) He did not state why he was recommending denial though he did state that if the LCC allowed plaintiff the permit, four structural defects at the bar should be corrected. As I read this letter, the listing of these four structural problems was in no way intended to fully explain defendant's refusal to approve the application. The Village counsel also recommended that the permit be denied.

Sometime after the LCC denied plaintiff's initial application, a committee was formed to advise the Elk Rapids Village Council on the subject of obscenity. Its

final recommendation did not focus exclusively on Brad's Town Bar but addressed a variety of obscenity related issues. (Plaintiff's Exhibit 22.) Defendant's uncontradicted testimony was that he had no connection with the committee and was not involved in its formation, deliberations, or recommendation. The deposition testimony of Beth Karns, a member of the obscenity committee, supports defendant's assertion, (Karns Deposition at 15–16.), as does the trial testimony of Richard Kramer, the LCC agent assigned to Elk Rapids in 1983. The committee was eventually disbanded.

In August, 1983, plaintiff filed a second application for an entertainment permit. On a split vote the Village Council recommended that the permit be granted. (Plaintiff's Exhibit 19.) In a letter informing the LCC of the Council's decision, Ron Howell, the Village Manager, expressed the view that the state law should be modified to create a greater number of permits thus enabling communities to approve one type of entertainment without necessarily allowing for the range of activities permissible under the permit sought by plaintiff. Defendant signed that letter. (*Id.*) At trial he testified that he did not agree with everything in the letter. This is supported by the style of the letter which indicates that it was written by one person.

With respect to this second application for a permit, defendant submitted two letters to the LCC signed only by himself. The first dated November 16, 1983, listed five reasons why the police department would not support plaintiff's request for a permit. The letter stated:

1. Mr. Bradfield failed in his responsibility to have an adequate knowledge of the liquor laws of this state pertaining to the requirement of having an Entertainment Permit for a Topless Show and the appropriate dressing room facilities previously.

2. Mr. Bradfield showed a complete disregard for the Community's right of acceptance or rejection of a Topless Show by failing to go through the appropriate legislative body first, before a show was put on.

3. Mr. Bradfield failed to cooperate with this agency when first advised by this agency that a Topless Show was in violation of the state liquor laws and continued with the show.

4. Mr. Bradfield failed to cooperate with the Liquor Control Commission of this state by continuing with a Topless Show when he was advised by the District Supervisor, Ken Swathwood, that continuing with the Topless Show was in violation of state liquor laws without the Entertainment Permit.

5. Mr. Bradfield has failed in his responsibility to maintain a sanitary condition in his restroom facilities by continuing to allow a smelly odor to exist in them, even after being told by this agency to clean up the odor.

(Plaintiff's Exhibit 15.) The second, dated November 21, 1983, simply stated that the department could not support the application. (Plaintiff's Exhibit 16.)

At trial, defendant credibly testified that his main concern in denying plaintiff a permit was crowd control. Based on the past history of police calls to Brad's, he feared that neither plaintiff nor the three and one half person Elk Rapids police force would be able to handle the greater incidence of altercations that he believed would accompany "exotic dancing."

The testimony of a number of witnesses supports defendant's assertions. Richard Kramer testified that defendant's concerns seemed to be crime control and the inability of the three and one half person police force to handle any increase in altercations that might accompany "exotic dancing" such as that performed by Bambi. Thomas Masserang, a member of the Village Council in 1983, similarly testified that defendant believed that the issuance of an entertainment permit to Brad's Town Club would require overtime funding for the police force. In deposition Kenneth Swathwood stated that sometime after the first denial, defendant Blesma told him that he had not approved plaintiff's application because "[h]e felt that Mr. Bradfield couldn't control his establishment." (Swathwood

Deposition at 10.) Finally, Ms. Karns stated that she knew of no evidence that would support a finding that defendant failed to approve the application on moral grounds or for any reason having to do with obscenity. She further testified that the obscenity committee did not pressure defendant with respect to the permit recommendation. (Karns Deposition at 18.)

## II. Count I.

Plaintiff's claim in count I is premised on his allegation that defendant Blesma "based his decision not to approve Plaintiff's application for an entertainment permit on the preconceived assumption that Plaintiff would provide topless dancing...." (Complaint at 3.) Plaintiff asserts that defendant's denial on the basis of this alleged preconception amounts to an arbitrary and capricious, impermissible prior restraint of plaintiff's rights to free expression and association. In response to defendant's trial brief and defendant's arguments regarding count I, plaintiff states:

> [t]he factual basis for the Defendant's denial of a permit—is the essence of the case. The Plaintiff will show that there was and is no reason for the denial—other than the unconstitutional attempt to regulate morality ...

(Memorandum of Law in Response to Defendant's Trial Brief, Dec. 26, 1986, at 4.)

I am not convinced by a preponderance of the evidence that defendant Blesma's decision was morally based. Plaintiff's case with respect to count I rests almost entirely on seven factual items that he asserts support his claim. They are:

a) Plaintiff Bradfield had an "exemplary" L.C.C. record at the time he applied.

b) The Blesma denial letter of November 16, 1983 (Plaintiff's Exhibit # 15) is replete with "topless dancing" references.

c) After Blesma arrested Plaintiff, the village appointed an Obscenity Committee, and the Obscenity issue became a local "cause celebre." (Plaintiff's Exhibit # 22: Obscenity Committee Report; Plaintiff's Exhibit # 23: Obscenity Ordinance).

d) Village President and Blesma wrote a long letter to the L.C.C. discussing their moral concerns about Bradfield's entertainment permit. (Plaintiff's Exhibit # 19).

e) Local L.C.C. Inspector Kramer approved the entertainment permit but noted in his report that "Chief Blesma and Mr. Bradfield are, as you are aware, in disagreement regarding the issuance of an Entertainment Permit which would allow go-go dancers." (Plaintiff's Exhibit # 21).

f) Plaintiff Bradfield's business attorney, Mr. Fisher, wrote a long letter to the Village, during the Village Council's consideration of the obscenity dispute, discussing why the Village should not attempt to regulate morality against Bradfield. (Plaintiff's Exhibit # 10).

g) The attorney, Mr. Fisher, testified credibly at trial that morality was a "substantial factor" and a "but for" factor in Blesma's denial of the permit.

(Plaintiff's Closing Argument at 7.) I do not find these convincing evidence of the allegation that defendant's decision was morality based. First, points a and d are incorrect characterizations of the evidence presented at trial. Plaintiff did not have an exemplary record prior to his application for a liquor license. Despite the advice of defendant and LCC Inspector Swathwood that the Bambi performance would most likely result in the issuance of a citation, plaintiff allowed Bambi and Bullet to perform in his bar on two separate evenings. Consequently, he incurred two violations and was assessed $400.00. Furthermore, the letter written by the Village president and signed by Blesma did not discuss "their moral concerns about Bradfield's entertainment permit." Ron Howell simply recounted the community reaction to the possibility that an entertainment permit might be issued to Brad's and then stated that he recommended the institution of a system of permits that allowed for greater differentiation among various activities.

Second, points c and f were not shown to have any relationship to defendant Blesma. The transcript testimony specifically establishes that defendant had no connection to the Obscenity Committee. Similarly, nothing at trial, in the depositions, or in the exhibits demonstrates how the fact that plaintiff's business attorney wrote a letter to the Village Council discussing why the Village should not try to regulate morality with respect to plaintiff, is proof that defendant's decision not to recommend issuance of the permit was morality based.

Third, I do not believe any inference of a morality based decision can be drawn from points b and e. Point b refers to Blesma's letter of denial dated November 16, 1983. The plaintiff states that the letter is "replete with topless dancing references" as if on that basis alone one can conclude that defendant's decision was morality based. I cannot. Four of the five points made by defendant relate to plaintiff's failure to have knowledge of and obey Michigan law. Specifically they refer to the plaintiff's failure to acquire an entertainment permit before allowing Bambi and Bullet to perform in his bar. When defendant refers to that performance he uses the term "Topless Show." Testimony at trial, as well as the police report of January 28, 1983 (Plaintiff's Exhibit 3) establish the accuracy of this characterization. Defendant simply uses the term as a short-hand for the events that took place at plaintiff's bar in January of 1983. I see no basis in the use of this term for inferring that defendant denied plaintiff an entertainment permit on moral grounds. Similarly, with respect to point e, Kramer's reference to go-go dancers simply identifies the type of permit in question.

The only proof of any relevance to the determination of whether defendant's decision was morally based is Attorney Fisher's testimony. However, weighing that testimony together with all of the other evidence offered at trial, including defendant's testimony, I conclude that morality was not a "but for" or even a substantial factor in defendant's decision. Therefore, judgment with respect to count I is rendered for defendant.

## III. Count II.

To state a cause of action for denial of property without due process of law, plaintiff must allege that he has a property interest protected by the Fourteenth Amendment. The Constitution does not create property interests. They must arise from some independent source such as state law. *Leis v. Flynt*, 439 U.S. 438–39, 99 S.Ct. 698, 699, 58 L.Ed.2d 717 (1979). To have a property interest in a benefit conferred by state law, such as the right to undertake a licensed activity, an individual must have more than an abstract need or desire for it. A unilateral expectation is not enough. The individual must have a legitimate claim of entitlement to the benefit. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

Early in this case, defendant filed a motion to dismiss count II for lack of jurisdiction arguing that plaintiff had no property right protected by the Fourteenth Amendment. I denied that motion holding that the Michigan Court of Appeals in *Wong v. City of Riverview*, 126 Mich.App. 589, 337 N.W.2d 589 (1983) created an independent state law right to process out of which arose a property interest in the license sufficient to trigger the protection of the due process clause of the Fourteenth Amendment. (Opinion filed July 22, 1985, at 6.)

Upon careful rereading of the *Wong* opinion and the cases cited therein, and on re-examination of federal case law on property interests justifying Fourteenth Amendment protection, I have concluded that my earlier opinion was incorrect. For the reasons discussed below, I am satisfied that plaintiff does not have a property interest in an LCC entertainment permit sufficient to invoke the protection of the Fourteenth Amendment or the jurisdiction of the federal courts.

First of all, in *Wong*, the Michigan Court of Appeals made it clear that it was not creating a right protected by the due process clause of the Constitution. Only after carefully pointing out that first time appli-

cants for liquor license, in contrast to holders of licenses, are not "even entitled to minimal due process," did the court hold that first-time applicants have an "extremely narrow" right to state judicial review to determine whether a governing body's denial of a liquor license was arbitrary and capricious. *Wong, supra,* at 590. Clearly, the *Wong* Court did not intend to confer a Fourteenth Amendment property right on first-time applicants.

This conclusion is in keeping with Michigan Supreme Court law as well as Sixth Circuit cases. In *Bisco's Inc. v. Liquor Control Comm.,* 395 Mich. 706, 238 N.W. 2d 166 (1976), the Michigan Supreme Court held that the holder of a liquor license has a due process interest in its renewal or revocation. However, the court explicitly stated that it did not wish to suggest that an applicant for a license had a similar entitlement. *Id.* at 718 n. 15, 238 N.W.2d 166. The Michigan Court of Appeals cited this statement in *Wong.*

Similarly in *Shamie v. City of Pontiac,* 620 F.2d 118 (6th Cir.1980), the Sixth Circuit held that a first-time liquor license applicant did not enjoy procedural due process rights under Michigan law. Plaintiff Shamie had, for nine years, unsuccessfully attempted to obtain a liquor license from the City of Pontiac. Eventually he filed suit in federal court under Section 1983. At a preliminary hearing, counsel for the city assured the court that Pontiac would process plaintiff's then pending application in accordance with new procedures outlined in a city ordinance. At the suggestion of the court, Pontiac's counsel also agreed that in the event that plaintiff's application was denied, the city would provide an explanation for their action. The court issued an order embodying the parties' agreement. Pontiac subsequently denied plaintiff's application stating that plaintiff's proposal was not consistent with established priorities. Plaintiff amended his proposal and resubmitted it. It was again denied this time without explanation.

Before the Sixth Circuit Court of Appeals, plaintiff Shamie argued that the agreement with the City's attorney placed him in the "constitutional position of a license holder facing revocation of his license." *Id.* at 120. Comparing the facts before it to the facts in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed. 2d 570 (1972), the Sixth Circuit concluded that "[t]he City's agreement altered Shamie's legal rights only insofar as he thereby became entitled to the benefit of his bargain.... Shamie's expectations here simply do not rise to the level of the 'property interests' traditionally afforded due process protection." *Id.* at 121. The court stated that Shamie was not in a position comparable to welfare recipients threatened with loss of benefits, parolees who are threatened with revocation of their parole, wage earners against whom an order of attachment is sought, or a driver who faces revocation of his driver's license. *Id.* (citations omitted).

I see nothing in the case before me to distinguish it from *Shamie.* Plaintiff Bradfield's claim of a property interest is no stronger than Shamie's and arguably it is weaker as he has no court order requiring that defendant Blesma provide him with an explanation of his recommendation. Plaintiff's alleged property interest rests only on a right of review that the Michigan Court of Appeals, the creator of this right, says does not rise to the level of an interest protected by the federal due process clause. *See also Sanderson v. Village of Greenhills,* 726 F.2d 284 (6th Cir.) (citing *Shamie* and holding that under Ohio law a first time appellant for a pool hall operator's license had no property interest protected by the Fourteenth Amendment).

■ Generally, an applicant for a license will only be held to have a legitimate, Fourteenth Amendment claim of entitlement to the issuance of that license on a finding that, absent the alleged denial of process, there is a certainty or very strong likelihood that the permit or license would have been granted. *Yale Auto Parts, Inc. v. Johnson,* 758 F.2d 54, 58–59 (2d Cir. 1985). In the case at bar no such determination can be made. Neither the state law contained in § 436.1 *et seq.* nor the LCC impose particularized standards on chiefs of police making recommendations with respect to the granting of new licenses. If

they did, I might have been able to measure plaintiff's case for a permit against those particularized standards to determine whether absent defendant's alleged arbitrary and unconstitutional behavior, the plaintiff would have received the entertainment permit. Only if he would have, would plaintiff have had a property right in the opportunity to obtain a permit sufficient to invoke federal jurisdiction. *See Spruytte v. Walters*, 753 F.2d 498, 506–07 (6th Cir. 1985).

The only standard governing defendant's behavior is the requirement in *Wong* that he not act in an arbitrary and capricious manner. This is not enough to invoke federal due process rights. Even were I convinced, which I am not, that defendant did act in an arbitrary and capricious manner, I would nevertheless have no way of knowing whether absent the arbitrary behavior on the part of defendant Blesma, plaintiff would be substantially likely to have received the entertainment permit. Without articulated standards, there is no way of determining whether another individual acting as Chief of Police or even defendant Blesma, acting in an unarbitrary manner, would have recommended that the permit be granted.

Finally, federalism concerns weigh against finding a protected federal interest every time established state policy is violated. To grant federal jurisdiction on the mere claim that a state administrative body or official acted arbitrarily and that such arbitrary conduct is prohibited by state case law, would "put the federal cart before the state horse." It would create an endless source of federal-state conflict in an area that is primarily of state concern and promote forum shopping. *Yale, supra*, at 59. Accordingly, I dismiss count II for lack of federal jurisdiction.

For the reasons stated above, judgment is entered for the defendant with respect to count I. Count II is dismissed for lack of jurisdiction. Count IV, for attorney fees and costs, is also denied.