RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0048p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

ROBERT W. BETHEL,

       *Plaintiff-Appellant,*

  *v.*

CHARLOTTE JENKINS, Warden; MICHAEL ALLEN EIRING, Lieutenant; TIMOTHY SHOOP, Warden,

       *Defendants-Appellees.*

> No. 19-3392

─────────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:15-cv-03016—Algenon L. Marbley, District Judge.

Decided and Filed: February 25, 2021

Before: BATCHELDER, CLAY, and BUSH, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ON BRIEF:** Mindy Worly, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees. Robert W. Bethel, Chillicothe, Ohio, pro se.

─────────────────

## OPINION

─────────────────

CLAY, Circuit Judge. Plaintiff Robert W. Bethel, proceeding pro se, appeals the district court's grant of summary judgment to Defendants, Warden Charlotte Jenkins, Lieutenant Michael Allen Eiring, and Warden Timothy Shoop, former and current officials at Chillicothe Correctional Institution ("CCI"). On appeal, Bethel argues that the district court erred by (1) finding that CCI's policy—prohibiting inmates from receiving packages ordered by third parties from unapproved vendors—did not violate his First Amendment right to free speech

pursuant to *Turner v. Safley*, 482 U.S. 78 (1987); (2) finding that he had no protected interest under procedural due process that was violated by the policy and that Bethel received sufficient process; and (3) determining that Defendants were entitled to qualified immunity and failing to find that Defendants violated Bethel's clearly established rights. For the reasons set forth below, we **AFFIRM** the district court's judgment.

## BACKGROUND

Bethel is presently incarcerated at CCI in Chillicothe, Ohio, serving a capital sentence. On February 6, 2015, pursuant to Ohio Department of Rehabilitation and Corrections ("ODRC") Policy 61-PRP-01, Defendants Jenkins and Eiring implemented a policy at CCI prohibiting "orders for printed material placed by third parties through unapproved vendors." (R. 68-5, Jenkins Decl. at PageID # 1398; R. 67-1, Eiring Mem. at PageID # 1080–81.) An inmate's family or friends could only place orders on their behalf through an approved vendor, and any orders from unapproved vendors had to "be initiated by the inmate and approved by CCI staff." (R. 67-1, Eiring Mem. at PageID # 1081.) And in the event that "an inmate [was] sent a package from an unapproved source," the inmate had "the option of returning the package to the vendor at the inmate's expense or having the package destroyed." (*Id.*) Pursuant to this policy, between March 2015 and June 2015, Defendants withheld four books from Bethel on the grounds that they were not ordered by Bethel, and Bethel received notice explaining why the books were being withheld and offering him the option of having the books mailed back or destroyed.

On multiple occasions, Bethel tried to appeal the withholding decision by requesting a Form DRC 4147 from Eiring, who explained that the books were withheld because they were not ordered by Bethel through his institutional account and, had they been withheld based on content, he could receive a Form DRC 4147. Bethel also used the prison's internal communication system to ask Eiring and mailroom staff whether his books were withheld because they believed the books were not from a distributor or because the books were deemed to pose a security threat to CCI. Both Eiring and a mailroom employee responded that the books were withheld because they were not ordered by Bethel from his institutional account. Bethel later learned from Gary Otte and Freddie McNeill, also incarcerated at CCI, that they had both ordered and received religious books, which were initially withheld for being ordered by a third

party but were then intercepted by the chaplain for review of their religious content. The CCI Chaplain confirmed this occurrence, informing Bethel that Defendants were allowing violations of the policy by permitting the chaplain to screen religious printed materials ordered by third parties that would otherwise be withheld and then to give those materials to the inmates for whom they were intended.

Bethel proceeded to file a grievance against Eiring and multiple informal complaint resolutions, requesting that CCI stop implementing this policy and that he be reimbursed for the postage he purchased to return the books that were withheld. His grievance was denied on the ground that the book was ordered by a third party from an unapproved vendor, in violation of ODRC policy, on which Bethel had received a memorandum. Bethel continued to file grievances on the same grounds, which were similarly denied and affirmed on appeal to the Chief Inspector.

Bethel filed suit under 42 U.S.C. § 1983 against Defendants Jenkins and Eiring for violating his constitutional rights under the Free Speech and Establishment Clauses of the First Amendment as well as the Due Process and Equal Protection Clauses of the Fourteenth Amendment in implementing and enforcing this policy. He sued Defendants in their individual and official capacities and sought declaratory and injunctive relief, as well as compensatory and nominal damages. Defendants moved for judgment on the pleadings, which, upon the recommendation of a magistrate judge, was granted by the district court. We affirmed the dismissal of the Establishment Clause claim but reversed the dismissal of the Free Speech and Procedural Due Process claims, finding that Bethel had sufficiently alleged these claims.[1] *Bethel v. Jenkins*, No. 16-4185, 2017 WL 4863118, at *4 (6th Cir. Sept. 22, 2017).

On remand, Bethel filed an amended complaint, seeking declaratory and injunctive relief as well as compensatory, nominal, and punitive damages against Defendants for free speech and due process violations. He alleged that (1) Defendants violated his right to free speech by preventing him from receiving printed materials ordered by third parties pursuant to CCI policy and by allowing for violation of the policy for religious materials; and (2) Defendants violated

---

[1]Bethel failed to raise the dismissal of his Equal Protection claim on appeal, so we deemed it waived. *Bethel*, 2017 WL 4863118, at *1.

his right to procedural due process by withholding these books and denying his requests to appeal the withholding decisions as well as to receive pre-approval exemption from the policy. Notably, before the first appeal was filed and decided, on March 1, 2017, CCI rescinded the policy and replaced it with one allowing orders for printed materials by a third party from a publisher or distributor.**2**

Defendants and Bethel both moved for summary judgment on all claims. Defendants argued that they were entitled to judgment as a matter of law because (1) the policy of banning third-party book orders from unapproved vendors was reasonably related to the legitimate penological interest of preventing contraband from entering the prison and preserving prison security; (2) the policy was a reasonable regulation on any interest Bethel had in receiving the books and Bethel failed to allege insufficient post-deprivation remedies; and (3) Bethel had not demonstrated that he had a clearly established right to obtain the books withheld.

In his motion for summary judgment, Bethel argued that (1) Ohio law provided him the right to receive publications that do not pose a security threat to the prison and come from a publisher or distributor, and Defendants' failure to give him notice of the reason for withholding the books and to provide him review of the withholding decisions violated his due process; (2) the policy did not reasonably relate to the legitimate penological interest of preventing contraband from entering the prison; and (3) Defendants were not entitled to qualified immunity because they violated clearly established state law requiring them to provide Bethel with notice and an opportunity to be heard regarding the withheld publications and giving him a right to receive publications that do not pose a security threat.

---

**2**Defendants filed a motion to dismiss the original complaint for mootness based on the rescinding of the old policy, but the district court deemed the motion to dismiss moot based on Bethel's filing of the amended complaint. Defendants then filed a motion to dismiss the amended complaint for mootness, but the district court denied this motion, based on the magistrate judge's recommendation. The magistrate judge found that the claims for declaratory and injunctive relief were not moot because Defendants had failed to show that they could not be reasonably expected to reinstate the policy, and that his claims for damages could not be mooted by voluntary cessation of the policy or dismissed on the grounds that it was "his own mother, not Defendants, who prevented him from ordering the printed materials he wanted." (R. 63, Order and R & R at PageID # 1002.) The magistrate judge did say that "the Undersigned expresses no opinion on the validity of Plaintiff's claims if additional evidence is submitted at the summary judgment stage." (*Id.*)

Based on the recommendation of the magistrate judge, the district court granted summary judgment to Defendants and denied summary judgment to Bethel.[3] The district court found that the magistrate judge correctly determined that the "publisher only" policy was neutral and supported by the legitimate penological interest of preventing the entry of contraband into the prison, and there were reasonable alternative means for Bethel to acquire these books. The district court also found that the magistrate judge correctly determined that Bethel received sufficient process following the withholding of his books through written notice, the prison grievance procedure, and the ability to send back the book to the third party. Finally, the district court agreed with the magistrate judge that Defendants were entitled to qualified immunity in their individual capacities because they did not violate Bethel's clearly established rights under the First and Fourteenth Amendments. This timely appeal followed.

## DISCUSSION

### Standard of Review

"This Court reviews a district court's grant of summary judgment *de novo*." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). This includes a district court's determination of qualified immunity. *See Daugherty v. Campbell*, 935 F.2d 780, 783 (6th Cir. 1991) ("Whether qualified immunity is applicable to an official's actions is a question of law."). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit," and a genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The moving party bears the burden of showing that no genuine issues of material fact exist." *Rafferty v. Trumbull County*, 915 F.3d 1087, 1093 (6th Cir. 2019). Once the moving party has met their burden, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial," although the evidence need not be

---

[3]The district court, pursuant to the magistrate judge's recommendation, also granted Bethel's motion for leave to amend the complaint naming Timothy Shoop, the current Warden of CCI, as a defendant because Jenkins no longer served as Warden and could not provide the requested injunctive relief.

"in a form that would be admissible at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotations omitted). All reasonable inferences will be drawn in favor of the non-moving party. *Mutchler v. Dunlap Mem'l Hosp.*, 485 F.3d 854, 857 (6th Cir. 2007). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *Moran*, 788 F.3d at 204 (noting that the district court cannot make credibility judgments or weigh the evidence at summary judgment).

## I.        Violation of Bethel's First Amendment Right to Information and Ideas

Bethel argues that the district court erred in granting summary judgment to Defendants on his First Amendment claim based on an improper application of the *Turner* factors. The First Amendment protects "the right to receive information and ideas," which, as applicable in the prison context, extends to the right to receive mail and to access reading material. *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972); *see also Parrish v. Johnson*, 800 F.2d 600, 603 (6th Cir. 1986) (noting that "prisoners have some First Amendment rights in receiving mail"); *Thornburgh v. Abbott*, 490 U.S. 401, 407–08 (1989) (describing publishers' "legitimate First Amendment interest in access to prisoners" in the context of analyzing a prisoner's right to receive publications). As recognized by the Supreme Court, individuals retain some constitutional protections while incarcerated, including rights provided by the First Amendment. *Turner v. Safley*, 482 U.S. 78, 84 (1987) ("[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates."). Because lawful incarceration necessarily limits an individual's constitutional rights while in prison, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). And given that "the realities of running a penal institution are complex and difficult," prison officials are afforded "wide-ranging deference" in their decisions regarding prison administration and regulation as courts are generally ill-equipped to deal with these problems. *Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 126 (1977).

Taking into account prison officials' need for flexibility in making day-to-day decisions on prison operations, the Supreme Court held in *Turner* that "when a prison regulation impinges

on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. In that case, the Supreme Court laid out four factors "relevant in determining the reasonableness of the [prison] regulation at issue" as follows: (1) whether there is a "'valid rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it;" (2) "whether there are alternative means of exercising the right that remain open to prison inmates;" (3) "the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and (4) "the absence of ready alternatives" to the regulation for prison officials. *Id.* at 89–90 (internal citation omitted).

Regarding the first factor, the "logical connection between the regulation and the asserted goal" cannot be "so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90. Additionally, "the governmental objective must be a legitimate and neutral one," and neutrality in the First Amendment context means that it must be applied "without regard to the content of expression." *Id.* at 90. *But see Hanrahan v. Mohr*, 905 F.3d 947, 956–57 (6th Cir. 2018) ("Determining that specific speech, based on its content, carries a security risk while other speech does not and then drawing a distinction based on this legitimate penological objective satisfies *Turner*'s neutrality requirement."). If there is no rational connection between the regulation and the state justification, then "the regulation is unconstitutional, and the other factors do not matter." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999).

In the present case, as noted by the magistrate judge, Defendants argue that "the policy was implemented to eliminate security threats posed by contraband clandestinely transferred into the prison through gift publications." (R. 78, R. & R. at PageID # 1673.) In support of this justification,[4] Defendants offer the declaration of current CCI Warden Timothy Shoop, who explained that "[t]he problem with third-party book purchases is that after a book is purchased,

---

[4]In the Report and Recommendation, the magistrate judge describes the reason for the policy offered by the Defendants as a post hoc justification and proceeds to discuss whether *Turner* allows for the regulations in question to be justified by post hoc justifications, noting a circuit split on this issue. However, Defendants have maintained that the policy was animated by a concern for prison security, initially framing the justification for the policy as it being a "cost-effective protection against contraband" and providing more explanation as to the justification in the motion for summary judgment. (R. 23, R. & R. at PageID # 231); *see also Bethel*, 2017 WL 4863118, at *2 ("The defendants contend that this policy was enacted 'to cost-effectively eliminate the risk that a third party could surreptitiously repackage books in an attempt to flood the institution with hidden contraband.'").

contraband can be secreted in the binding and/or between pages." (R. 68-4, Shoop Decl. at PageID # 1394.) He further noted that the third party could repackage and ship the book to the prison with a label to make the book "look like it is coming directly from a publisher or distributor," and these books had no tracking numbers to determine whether they were "being shipped directly from a publisher or distributor." (*Id.*) And he provided two examples from July 2018, following the rescinding of the original policy, in which cell phones were hidden in books made to look as if they were sent from Barnes & Noble. (*Id.*)

Based on this undisputed evidence, the district court did not err in finding that the regulation bore a rational connection to the legitimate interest in preventing contraband from entering the prison and threatening security. The regulation is akin to "publisher only policies" that only allow prisoners to receive publications from approved publishers and vendors, which have been previously upheld. *Bell v. Wolfish*, 441 U.S. 520, 550 (1979) (holding that a "prohibition against receipt of hardback books unless mailed directly from publishers, book clubs, or bookstores does not violate the First Amendment rights of MCC inmates"); *Ward v. Washtenaw Cnty. Sheriff's Dep't*, 881 F.2d 325, 329–30 (6th Cir. 1989) (extending *Bell* to a "publisher only" policy for soft cover materials). And Defendants provided specific facts and evidence demonstrating the connection between prohibiting third-party orders from unapproved vendors and the entry of contraband into the prison. The regulation is supported by a legitimate justification in "protecting prison security," especially given the particular "security risk presented by incoming publications," as recognized by this Court and the Supreme Court. *Thornburgh*, 490 U.S. at 415–16; *Parrish*, 800 F.2d at 603. Additionally, the regulation was neutrally applied because the regulation prohibited printed materials based on how they were ordered (i.e., by a third party from an unapproved vendor) as opposed to their content. *See Thornburgh*, 490 U.S. at 415.

Bethel contends that Defendants failed to establish a nexus between the policy and the proffered penological interest in preventing contraband from entering the prison through forged packages because CCI does not use tracking numbers for inmate orders. However, as the magistrate judge correctly noted, this fact does not place Defendants' evidence of contraband entering the prison through third party packages in dispute. Additionally, regardless of whether

an inmate's order includes tracking numbers, CCI can look to the Inmate Demand Statement for an inmate account to ascertain the amount of the transaction, an inmate's adjusted account balance, the purchase date, and the recipient of the funds. Bethel also argues that the connection between the policy and the justification was undermined by Defendants' disregard of the policy in screening and providing religious materials sent from third parties to inmates, despite their posing the same threat to security as non-religious materials. But, as we noted in Bethel's first appeal as to his Establishment Clause claim, Defendants were allowed to accommodate inmates' religious practices by essentially exempting religious materials from the policy in order to meet their obligations under the Free Exercise Clause.[5] *Bethel*, 2017 WL 4863118, at *3 (finding that "[a] reasonable person would not view the exception as an endorsement of religion but as an accommodation of inmate religious practices"); *see also Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–45 (1987) (noting that the Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause").

As for the second, third, and fourth factors from *Turner*, we have noted that "[t]he final three *Turner* factors should be balanced together." *Flagner v. Wilkinson*, 241 F.3d 475, 484 (6th Cir. 2001). Regarding alternative means of exercising the right at issue, the Supreme Court has indicated that "'the right' in question must be viewed sensibly and expansively," finding that this factor is satisfied if other means of expression related to the right are available. *Thornburgh*, 490 U.S. at 417–18. On the impact on guards, other inmates, and prison resources generally, in considering this factor, courts should generally defer "to the informed discretion of corrections officials," in particular "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff." *Turner*, 482 U.S. at 90. As to the absence of ready alternatives to the prison regulation, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* at 90; *Thornburgh*, 490 U.S. at 418. But this factor does not require prison

---

[5]Even if this exception undermined the nexus between the policy and proffered penological interest, it was not clearly established that the policy, when enacted with the exception, was a First Amendment violation, given Supreme Court precedent upholding "publisher only" policies and allowing for accommodation of religious practice. *See Bell*, 441 U.S. at 550; *see also Hobbie*, 480 U.S. at 144–45.

officials to pick the "least restrictive alternative;" rather, evidence of an "alternative that fully accommodates the prisoner's rights [at] a *de minimis* cost to valid penological interests" can demonstrate that the regulation does not bear a reasonable relationship to the proffered justification. *Turner*, 482 U.S. at 90–91.

The district court correctly found that based on the undisputed evidence the last three *Turner* factors weighed in favor of Defendants. Bethel does not dispute that he had alternative means of acquiring books—namely, using his own funds to purchase books, acquiring books through the interlibrary loan program, and asking family and friends to provide funds directly into his account or to send him subscription cards so that he could himself purchase these books. He only argues that these alternatives are inadequate because his family or friends will not put money in his institutional account for publications, CCI's interlibrary loan program did not have most of his requested publications available, and his institutional pay was insufficient to cover the materials he wanted. However, none of these facts dispute that Bethel had these alternate means of obtaining publications available to him, and *Turner* does not require that the alternate means fulfill Bethel's exact request. *See* 482 U.S. at 92 (noting that the prison offered adequate alternate means of communication as it "bar[red] communication only with a limited class of other people . . . inmates at other institutions within the Missouri prison system"); *Thornburgh*, 490 U.S. at 417–18 (finding that a prison regulation that restricted publications whose content was deemed to be a security risk met the second *Turner* factor by "permit[ting] a broad range of publications to be sent, received, and read").

On the third factor, the magistrate judge correctly noted that allowing gift publications from unapproved vendors placed significant costs on Defendants, which became evident when they rescinded the policy. In Defendant Shoop's declaration, he indicated that allowing third party orders from unapproved vendors has slowed down the processing of mail, required CCI to "pull additional staff" and "purchase[] an x-ray machine for $20,957 in an effort to lessen the burden on staff," and led to incidences of contraband entering the prison, none of which Bethel disputes. (R. 68-4, Shoop Decl. at PageID # 1394.) As to the fourth factor, the magistrate judge correctly found that none of Bethel's proposed alternatives of confirmation emails and volume control could be implemented at a de minimis cost to the interest in prison security. (R. 78, R.

& R. at PageID # 1677–78.)  Confirmation emails would pose a similar concern of forgery, and any limit to the number of gift publications an inmate could receive would likely limit Bethel's and other inmates' ability to receive books, placing Defendants at risk for further litigation. Accordingly, the prison policy of banning third party orders from unapproved vendors is not an "exaggerated response" to the concern of contraband entering the prison.  *See Thornburgh*, 490 U.S. at 419 (finding that it was proper for prison official to reject a "less restrictive alternative because of reasonably founded fears that it will lead to greater harm" and "the administrative inconvenience of this proposed alternative").  Ultimately, there is no genuine dispute of material fact that CCI's policy did not violate Bethel's First Amendment right to receive information and ideas because, under *Turner*, the regulation bore a reasonable relationship to the legitimate penological interest in preventing contraband from entering the prison and threatening security.

## II.        Violation of Bethel's Right to Procedural Due Process

Bethel contends that Defendants violated his right to procedural due process because they infringed on his protected property interest under Ohio Rev. Code § 5120.427[6] and Ohio Admin. Code § 5120-9-19[7] to receive nonthreatening publications.  He also argues that Defendants did not provide him sufficient process inasmuch as they failed to conduct security threat determinations of the books and to allow him to have the withholding decisions reviewed.

In accordance with the Supreme Court's decision in *Wolff v. McDonnell*, prisoners retain rights under the Due Process Clause and cannot be "deprived of life, liberty, or property without due process of law," but these rights are "subject to restrictions imposed by the nature of the regime to which they have been lawfully committed."  418 U.S. 539, 556 (1974).  The Supreme

---

[6]Ohio Revised Code § 5120.427 provides that "[e]ach prisoner confined in a state correctional institution may receive a reasonable number of materials directly from the publishers or other distributors of those materials," and "[i]f the warden or the warden's designee determines that an incoming material is not a prohibited inflammatory material, the warden or the warden's designee shall cause the material to be promptly forwarded to the prisoner who is its intended recipient."  Ohio Rev. Code § 5120.427(A), (B)(2).

[7]Ohio Administrative Code § 5120-9-19 provides that "[a]n inmate may receive a reasonable number of printed materials subject to the following limitations," and "[i]f the managing officer or the managing officer's designee, determines that the material may be permitted into the institution, then the material shall be promptly forwarded to the inmate."  Ohio Admin. Code § 5120-9-19(B), (D)(4).

Court has provided two steps for analyzing procedural due process claims: (1) "whether there exists a liberty or property interest which has been interfered with by the State" and (2) "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). In order to have a protected property interest, an individual must "have a legitimate claim of entitlement" to the property interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Additionally, property interests "are not created by the Constitution;" rather, they are established by "an independent source such as state law." *Id.*

Before the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472 (1995), prison regulations were found to create protected liberty interests when those regulations "used language of an unmistakably mandatory character," such as, for example, "requiring that certain procedures 'shall,' 'will,' or 'must' be employed." *Hewitt v. Helms*, 459 U.S. 460, 471 (1983). Accordingly, in *Spruytte v. Walters*, we found, based on *Hewitt*, that a Michigan prison regulation created a protected interest to receive any book not deemed to be a security threat because the regulation contained "specific, substantive criteria restrict[ing] officials' discretion."[8] 753 F.2d 498, 507–08 (6th Cir. 1985), *abrogation recognized by Virgili v. Gilbert*, 272 F.3d 391 (6th Cir. 2001). However, in *Sandin*, the Supreme Court explicitly rejected the approach from *Hewitt* and held that liberty interests arising from state prison regulations are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484 (citations omitted).

We have not yet determined whether *Sandin* applies to property interests, but we have cited *Sandin* to hold that an inmate does not have a protected interest in prison employment. *Pickelhaupt v. Jackson*, 364 F. App'x 221, 225–26 (6th Cir. 2010) ("Both this Court and the

---

[8]We indicated in *Spruytte* that "Spruytte's claim that he is entitled to receive the dictionary may be plausibly cast as an assertion of either a property interest or a liberty interest." 753 F.2d at 506. We found that the claim could be characterized as Spruytte being "entitled to possess a tangible object" as well as being "entitled to receive a book that concededly he could possess were he not incarcerated." *Id.* In the present case, Bethel characterizes his interest in receiving publications not deemed to be a security threat as a property interest.

Ninth Circuit have suggested but not directly held that *Sandin* does not apply to *Hewitt*-type property interests."); *Dobbins v. Craycraft*, 423 F. App'x 550, 552 (6th Cir. 2011) (finding that "Dobbins' procedural due process claim against Besteman was properly dismissed for failure to allege a liberty or property interest" given that he had "no constitutional right to prison employment because the loss of his position d[id] not impose an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life'" (quoting *Sandin*, 515 U.S. at 484)).

But we need not decide whether *Sandin* applies to property interests because, even assuming Bethel had a protected interest, the magistrate judge correctly found in the alternative that Bethel received sufficient process as to that interest. In determining the necessary procedures under procedural due process, courts consider (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). In the present case, the magistrate judge noted that Bethel received written notice that the books were withheld as well as notice of the reason why they were withheld, that he was able to use CCI's grievance process to seek further review, and that Defendants allowed Bethel to either have the publications destroyed or sent back to the third party who ordered them.

Applying the balancing test under *Mathews*, these procedures were adequate as the private interest in receiving the books pursuant to the third-party orders was minimal as compared to the significant government interest in preventing contraband from entering the prison. *See Procunier v. Martinez*, 416 U.S. 396, 417 (1974) (noting that the analogous "decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards"), *overruled on other grounds by Thornburgh*, 490 U.S. 401. The risk of erroneous deprivation was small because Bethel could acquire the publications through alternate means. The value of additional procedures was also limited given the lack of complexity in the withholding decision, and it was outweighed by the burden on the prison of expending resources

on further proceedings. Even assuming Bethel had a protected property interest in receiving the withheld publications, he received sufficient process from CCI regarding the deprivation.**9** *See Sickles v. Campbell County*, 501 F.3d 726, 731 (6th Cir. 2007) (holding that "[i]n view of the modest private interests at stake, the small risk of error, the limited benefits of additional safeguards and the unchallenged government interests in the policy," the plaintiffs were not entitled to a pre-deprivation hearing regarding a policy withholding some funds from their canteen account).

## III. Qualified Immunity

Bethel argues that, because Defendants violated clearly established Ohio statutory and administrative laws that provide the basis of his constitutional claims, the district court erred in finding that Defendants were entitled to qualified immunity. *See Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984). According to the Supreme Court's decision in *Harlow v. Fitzgerald*, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818 (1982). Qualified immunity claims are analyzed under a two-prong test: (1) whether "[t]aken in the light most favorable to the party asserting the injury, [] the facts alleged show the officer's conduct violated a constitutional right," and (2) "whether the right was clearly established . . . in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). After *Pearson v. Callahan*, which held that the two-step sequence set forth in *Saucier* is no longer mandatory, district courts and courts of appeals are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. 223, 236 (2009).

---

**9**Defendants also argue, in response to Bethel's request that we take judicial notice that Bethel's claims for declaratory and injunctive relief are not moot, that Bethel has waived this argument on appeal because he did not object on mootness grounds to the magistrate judge's recommendation to dismiss those claims, despite Defendants' evidence indicating that CCI did not intend to reinstate the policy. However, neither the magistrate judge nor the district court addressed in their orders whether Defendants met their burden to show that they could not be reasonably expected to reinstate the policy for purposes of determining whether Bethel's claims for declaratory and injunctive relief were moot, finding instead that Defendants were entitled to summary judgment on the merits. Given that we affirm the dismissal of the claims for declaratory and injunctive relief as well as damages on the merits, we need not address the mootness argument on appeal.

Because we find that there was no violation of Bethel's First Amendment or procedural due process rights, Defendants are entitled to qualified immunity as a matter of law. *See Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). And even if there was a violation of a constitutional right, Bethel cannot show that a right to receive books withheld pursuant to a ban of third-party orders from unapproved vendors was clearly established, especially given precedent upholding "publisher only" policies, *see Bell*, 441 U.S. at 550, and the process provided following the withholding of books.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.